Good morning, and may it please the Court. I will focus the argument today on two key issues developed in the briefing. First, the District Court's Article III Standing Analysis lost sight of what the Supreme Court calls the proper and properly limited role of the courts in a democratic society. Second, the District Court's Economic Benefit Analysis, which decoupled the projects that are the basis of that calculation from the violations at issue in the suit, is both an error in this case and it places the industry in a Catch-22 going forward that cannot withstand review. So if any aspect of this case is remanded from further proceedings, that error needs to be corrected. But we don't believe that it will be necessary to remand any part of the case because I believe that the case can be reversed and rendered on standing grounds, and I'll begin the argument there. The ExxonMobil standing position stands on three fundamental principles of Article III doctrine that I believe are not subject to any reasonable dispute. The first is that standing is not dispensed in gross, so every element of standing must be established for each penalty claim. The second is that the burden of proving standing increases as the litigation progresses, and at trial, the elements of standing must be proved to the satisfaction of the fact finder. And the third is that— After I think about seven years of litigation and one full appeal to the court, is standing still a live issue? I'm looking at the last opinion from this court, which, as you know, was very thorough, and it ends by saying we vacate the district court's judgment and remand for assessment of penalties based on the violations that are properly considered actionable. I mean, it's a remand for penalties. Why under the mandate rule isn't that what's left in this case? Because the jurisdictional issue of Article III standing cannot be waived and cannot be foreclosed by the mandate rule, and that is the holding of this court in the USPPS case, which squarely determined that merely exercising jurisdiction over an appeal, if the jurisdictional issue was not litigated and was not addressed by the opinion, does not foreclose the standing issue. In fact, that was rooted in the Supreme Court's decision in the Steel Company case that said drive-by jurisdictional holdings of that sort, merely an exercise of jurisdiction, does not preclude a future Article III challenge. I don't think it could ever be waived, but under USPPS, it absolutely cannot be waived under this court's precedent. But standing was – it certainly wasn't a feature, I'll give you that, but it was mentioned in the prior appeal, and to find – the prior panel found there were violations. Isn't it implicit in that that there's standing? No, Your Honor. That argument by the plaintiffs is directly in the face of USPPS. That's exactly the argument this court rejected in USPPS. Standing was not litigated in the prior appeal. The only reference was a footnote acknowledgment in the ExxonMobil brief of Appley that standing had been an issue below. But there was never any briefing clashing on the issue of standing. We did not challenge standing because we were defending a take-nothing judgment in favor of ExxonMobil. The court of appeals did not address standing, and so that idea that there's somehow an implicit resolution of standing is exactly the rule that this court rejected in USPPS. Turning back to the three principles that I think guide the analysis, the final principle is that statutory violations that do not cause concrete and particularized injuries to individual plaintiffs are not justiciable. And when you fuse those three principles, this judgment that awards a $20 million civil penalty based on more than 16,000 days of violations with findings of only five admissions events and 40 days of violations that are arguably traceable to injuries, in fact, of these plaintiffs cannot withstand review. Counsel, can you help me with the math problem on the days of violation? So I noticed you provide a very helpful footnote in the blue brief. I'm looking at footnote two, which describes how we get to 16,000 days of violation from the much smaller inputs that you just mentioned. Yes. So if there are four different chemicals emitted for one hour on one day, that's four admission days, according to the— According to the plaintiff's calculation, which the district court accepted. And are you challenging that? We are not contesting it here. I do think that in another case, that might be a basis for challenge, but for purposes of this appeal, we're not contesting that calculation. So that means that we read days of violation to not mean calendar days of violation. We read it to mean days of violation times number of permit condition violations? Does that— I think that's essentially right. Days on which a permit violation of a particular permit limit or standard was exceeded is the way in which the plaintiffs have calculated it. And is that law of the case or something, or is it some part of our circuit precedent that days of violation doesn't mean— Because I read days of violation, it sounds like a day on which there's a violation. It doesn't mean permit conditions times days of violation. Your Honor, I don't believe that this court has squarely decided that question. My friends for the plaintiffs can certainly correct me if I'm mistaken. I think that is arguably an open question. But ExxonMobil is not here today to argue about the precise count of the violations, and so we didn't litigate that issue. We were here on the standing issues and then the economic benefit analysis principally. But I appreciate the court's question, and the reason we didn't litigate it today is because we feel there are more important errors in the case. I want to try to get a sense of how demanding you think the traceability requirement is. Take count four, which alleges violations of visible emissions from the flares, and there were at least one or two of the plaintiffs who testified said they saw flares. Would you require a finding that, you know, if the flare was to them to say, I saw the flare on November 5th, or just that I generally saw flares and evidence that the flares were visible in that neighborhood? I think it's important, Your Honor, to differentiate the finding from the evidence. What we argue is that there must be a finding of traceability between the event that the plaintiff experienced and a violation. Now, the evidence might not be that particularized. A plaintiff might give evidence that is perhaps more general in his or her testimony from which a judge or a jury as a fact finder could infer a connection. The point here, though, is that that evidence wasn't given, and Judge Hittner didn't make such a finding. The only finding of traceability he found was to these five specific emission events. Would you require, I mean, 17,000, I might have the number wrong, but, you know, thousands of findings on standing, one for each violation has to have a separate standing finding? Or can he say, here's 200 sulfur dioxide emission violations, and Plaintiff X lived half a mile away, and there's, I'm not saying there is this evidence, but there's evidence from the air modeling that emissions at this level went into that plaintiff's neighborhood. Your Honor, I'm not here to dictate the way in which the district court expresses the findings, but to be clear, yes, in some appropriate manner, the district court must establish a traceable connection between a violation and the plaintiff's injury. And here, yes, Your Honor. Judge Costa's original question about seeing the flares, the way I understand the argument, it is not enough to see the flare. It has to be, you saw an unlawful flare, right? Exactly. So it's the unlawful flare connected somehow. That is exactly right. And, in fact, you've anticipated the answer I was about to give. No, not at all. I appreciate the question because that's exactly right. Remember that an injury, for Article III purposes, is not a plaintiff's experience of an event. An injury is defined by the Supreme Court as the invasion of a legally protected right. Flaring, per se, is not illegal. Odors from chemical emissions are not illegal. And so the traceability requirement requires traceability to an injury, which is an invasion of a legally protected right, which means Let me follow. I'm going to give, if you can give both sides five more minutes because there's a complex case. There's a lot to argue. On the flares, I mean, how would plaintiffs show, other than saying, I saw flares, I lived there, I'd always see flares. I mean, how would they show that they saw one on a particular day that was unlawful? Your Honor, they did it in this case with respect to these five events. They identified the dates upon which they experienced flaring, and they compared it to the ExxonMobil records that identified what they alleged to be violations. They could have done it. But how would a plaintiff remember what? I mean, is it enough that evidentiary-wise to say, I generally saw flaring, and then there's evidence that, you know, four times a month there was unlawful flaring? No, that's not enough. How would they ever prove it then? How's a plaintiff going to know what's an unlawful, I saw an unlawful one versus a lawful one? A plaintiff has to know when the plaintiff experienced the event that he or she believes is an injury. Then he has to be able to tie it to a record that establishes it was a violation. There's nothing inappropriate. How would you, what evidence would ever allow a plaintiff to say, I saw, I mean, unless it was just some extreme flaring. Precisely in the way that it happened in this case, Your Honor. It's not a difficult burden. It could have been done theoretically for many more violations had the plaintiff chosen to try and do it. What they tried to do instead is just to say, these are injuries to the environment. That's not enough for Article III standing. It has to be an injury to the plaintiff personally, not an injury to the environment. That's what the Supreme Court laid down as the test in Laidlaw. That's what this Court has followed. And so you can't relax that standard to say. Do you think Judge Wilkinson applied the right test in the Gaston Copper case? Your Honor, I think Gaston Copper is dealing with a different kind of issue. That's dealing with the extent to which the proof is necessary to establish traceability. That's not the principal argument we're making here. The principal argument we're making here is that Judge Hittner's findings actually found traceability only with respect to five particular admission events. Could he have found it more broadly? I suggest not on this record because the only evidence these plaintiffs introduced was of a traceable connection to these five events. But the fact is that's all he found, and that's what we're here to litigate. ExxonMobil accepts for purposes of the argument today that a traceable connection was made to those five events, but no further. And on that point, I want to make sure that during the course of the hearing. I don't see in these environmental cases where that kind of evidence was required. I mean, in Laidlaw, for example, one plaintiff said, you know, this was a Clean Water Act case and wastewater was discharged into the stream. He said, I'd like to fish in that stream like I did as a boy, and now I can't do it. And another one said he lived two miles from the facility and he used to picnic there and bird watch and enjoy the scenery, and now he can't do it. Your Honor, the reason that you don't see that in some of these cases is because those cases are determining this Article III standing question. At an earlier stage of the litigation where the court is saying the allegation is sufficient to establish standing or there's evidence at a summary judgment level that would allow an inference that this link could be established. But this is why the rule that I think controls this case is the rule that standing allegations must be proved at trial. So the allegations good enough to get over a Rule 12 motion or the evidence good enough to get over a summary judgment motion is not enough to establish standing for a particular claim of relief for civil penalties. It only gets past summary judgment if those facts, if ultimately believed by the fact finder, would be sufficient to establish the element, the element being standing. Correct, Your Honor. So if someone says I fished in that stream and courts have said that's okay as an allegation, it's okay at summary judgment, if the judge believes, okay, I believe that man that he fished in this stream, then that would be enough, prove it if proven at trial. That would be enough if proven at trial to establish some standing for some justiciable claim. But in those cases, in the summary judgment cases, the courts are never determining what's the full scope of the claim. Can a recovery be made for all these claims? And that is the issue on which the rule that standing must be proved at trial is decisive here. And I want to point to the Supreme Court's decision just this summer in the partisan gerrymandering case, which in many ways I think provides a roadmap for the decision here. That decision is Gill v. Whitford, as I'm sure the court knows. The citation is 138 Supreme Court, 1916. And in Gill, Chief Justice Roberts made the point, the plaintiffs in Gill alleged what they believed to be a justiciable violation of their rights but didn't actually prove at trial what they had alleged. And the holding here in Gill I think is decisive. The court says, we caution that standing is not dispensed in gross. A plaintiff's remedy must be tailored to redress the plaintiff's particular injury. And so when a plaintiff fails to prove at trial the full scope of the allegations that were made, fails to prove even the full scope of the inferences that might have been drawn in a summary judgment posture, the remedy must be limited. And the case is on that point. Why do you say the argument that this statute is not designed to compensate these plaintiffs? It's designed to penalize violations and prevent them from recurring? I mean, you don't argue that you'd have the same causation problem that you have in a tort case. No, it's not the same causation analysis as a tort case, but the answer to the fact that this statute doesn't compensate the plaintiffs has, I think, two consequences that are material to the standing analysis. The first is that the plaintiffs don't have a right to litigate any environmental grievance simply because the statute gives them a right to bring a citizen suit. That's exactly the proposition that the Supreme Court rejected last year in Spokio. A statutory right to sue not coupled to an individual injury is not justiciable. Second, the fact that the penalties don't redress those plaintiffs in any respect means that unless penalties will abate an ongoing violation or deter future violations, there is no redressability. And on this record, that prospect is foreclosed. And with respect to these five admissions events and the 40 days of violations that Judge Hittner found for standing, there is no evidence in this record whatsoever that any penalty could redress those events. The plaintiffs didn't even try to make that showing. And, in fact, Judge Hittner found Maybe it would be feasible to penalize the violator, though. Pardon? I mean, maybe the award would be proper to penalize the violator. Well, Your Honor, in a proper case, that is appropriate, and that is the job of the government regulators. That's the distinction that has to be drawn here for standing purposes because government regulators can bring enforcement actions that don't have to satisfy Congress expressly authorized citizens to seek these penalties. I mean, why isn't the fact that Exxon did reduce its admissions after this lawsuit, why doesn't that show that penalties can have that impact? Well, Your Honor, two answers here. The fact that Congress authorized citizens to seek the penalty is precisely the argument the Supreme Court rejected in Spokio as a basis for Article III standing. The fact that ExxonMobil was able to reduce its overall admissions is distinct from saying penalties can redress these particular admissions, which the district court found had already been corrected. The root causes were already corrected, and they cannot be universally precluded because of the very nature of upset admissions. And so in lay law, the Supreme Court said penalties can satisfy redressability if, number one, they abate an ongoing violation. That was an ongoing violation from a single root cause. Not the case here. Or, number two, if they will prevent future violations. The district court here found precisely the opposite, which is why there's no redressability. Going back to your Spokio argument, do you think the citizen suit provision is constitutional? Your Honor, I think the citizen suit provision is constitutional insofar as it allows citizens to sue for actual injuries they personally suffer, traceable to particular violations. That's the proper use of a citizen suit, and ExxonMobil does not resist it. But this is an abuse of the process. I'd like to turn, if I may, in my remaining . . . Why did the man who wanted to fish in the stream like he did as a boy, how is that different? Your Honor, that differs because here you're looking at the civil penalties that are being awarded. A gentleman who says, I want to fish in a stream and I want an injunction, which is typically how this issue is decided, the injunction will redress the course of conduct by stopping the polluter from continuing to violate. But if the man who wants to fish in the stream wants penalties on a per-day basis for every day he's unable to fish in the stream, he has to prove traceable injuries, in fact, to each day. That is the Article III irreducible minimum. What's your best case for that? Your Honor, I'd say the very best . . . Environmental case. I'm sorry, Your Honor? Give me an environmental case. Your Honor, I would say the best environmental case for that, I would point to the Laidlaw case and the Steel Company case. I think both stand for that proposition. Of course, the leading case in this area is Lujan, and I think Lujan laying out all of those basic principles in the environmental context is the irreducible . . . So when would a citizen in a Clean Air Act case show that a penalty meets the redressability standard as you define it? When emissions are ongoing from a source that the polluter . . . At the time the suit is filed or at the time the penalty is imposed? I would say at the time the suit is filed. Let's accept that as a principle for this purpose. When that pollution is ongoing at that time and has not been corrected, the pollution can be abated in theory by an imposition of civil penalties. But that's not the case here. That is not this record. That is manifestly the opposite of Judge Hitton's . . . Why can't penalties be awarded for past violations? Why can't they be awarded for past violations? The Steel Company case resolves that question because a wholly past violation doesn't redress any injury suffered by the plaintiffs here because the citizen suit plaintiff doesn't receive the money. The only redressability, and this is Justice Scalia's holding in Steel Company, is that it can only be redressable if it will abate a current violation or deter a future violation. It cannot reach past violations. If I may, I want to take the remaining time just to make the point that the economic benefit analysis in this case is a fundamental error that is crippling to the industry because the district court's approach untethers the projects that are the basis of the calculation from any proof that those projects were necessary to correct the violations at issue in the suit. If that is a proper rule, every environmental improvement project can become a basis for economic benefit determination without regard to whether it was necessary to correct a particular violation. That is a penalty on improvements that disserves the purpose of the Clean Air Act and cannot be reconciled with the statute. If there are no further questions, I'll yield the podium. All right, Mr. Posner. Thank you. You have five minutes for rebuttal. I'll hear from Mr. Nicholas, and you'll have 25 since I gave the other side an extra five minutes. May it please the Court. I would like to begin by discussing Article III standing and then focus on economic benefit. On both these issues, the district court made comprehensive factual findings that are not challenged by Exxon and applied the law as articulated by the Supreme Court, by this court, and by other circuits to have addressed these issues. The district court correctly found plaintiffs have standing. It properly applied the legal test for standing set out by this court in a long line of cases, Texans United, Cedar Point Oil, Friends of the Earth v. Crown Petroleum, and City of Jackson. And the district court's factual findings are sufficient to support its legal conclusion that plaintiffs have standing. Counsel? So you agree that the legal standard is that the associations have standing to the extent one of their plaintiffs would have standing? Yes, Your Honor. And you would further agree with me, as the Supreme Court has said, that a plaintiff must demonstrate standing for each claim they seek to press? Yes, Your Honor. So in that sense, the associations have standing to seek 16,386 claims to the extent a plaintiff would have standing. And when I say a plaintiff, I mean an individual would have standing to seek relief for 16,386 claims. Your Honor, in this case, plaintiffs did not assert 16,000 claims. There are 16,000 violations. Well, it's 16,386 times the statutory penalty, right? In this case, the plaintiff's claim is that Exxon is in violation of an emission limit. That's the claim. If there are multiple violations, as in this case, there are multiple violations of an emission limit, that's all one claim. So there are not 16,000 separate claims. Well, you have to have 16,386 on one variable in order to get to the $20 million in penalties, right? Your Honor, the statute provides that the maximum penalty that can be granted by – that can be imposed by a court is $35,000 a day – $30,000 per day of violation. So a day of violation by the plain text of the citizen's supervision is the claim. No, Your Honor. As this court ruled in its previous opinion, and as this court ruled in Carr v. Altaverde and as the district court ruled, a claim in a citizen suit, in a Clean Water Act or Clean Air Act citizen suit context, is that the defendant is in violation of an emission limit. So if I'm understanding that argument, then I don't need the associations. I could have had the one individual – and I've got the trial transcripts here. We could go through the one individual who says – or there are two individuals who say, I had a health event or I heard a bang or I smelled a noise. When I looked at STEERS, I saw that there was an emission event. So to strip away a lot of the difficult stuff in this case, we could just focus on those two individuals. The case could be called Individual 1 and Individual 2 versus ExxonMobil. And those two individuals could recover for 16,386 violation days or days of violation, pardon me, without the associations being in this at all, right? Individual people can bring citizen suits, yes. But they bring this citizen suit. Those two individuals that I'm referring to. The district court made findings that would have supported the individuals bringing this suit. The two that I just mentioned? That's correct. What case anywhere from our court, Supreme Court of the United States, any district court, any federal court has ever said that two individuals can bring a claim like I just described? And I'm not asking for drive-by jurisdictional holdings. I'm not asking for cases involving the Clean Water Act where the court doesn't examine it. What court has examined the question and said, on the facts I just gave you, I woke up, I heard a bang, I looked at steers, I saw that there was an event, therefore I can reclaim or I can make a claim for 16,386 days of violation? Again, the claim is not for 16,000 violations. Days of violation. Days of violations. The claim is violation of an admission limit. But Texans United stands for that proposition. Texans United is a summary judgment decision from this court. And at what point did Texans United say anything about this particular standing question? In Texans United, the individual members, the members of the groups, were able to link up, if you will, I believe two violations, two specific experiences. And this court ruled that that was sufficient for standing. Well, it says we disagree with the proposed test that would have to trace this. I'm reading to you from Texans United. If you have it in front of you, it's on page 793. We disagree with Crown's proposed test, that's the defendant in that case, for traceability because it conflates the issue of standing and the issue of actual liability. So it doesn't say that you don't have to prove the traceability that I just demonstrated, where you have a plaintiff with one event day traceable to one violation that's reported in STEERS and then makes a claim for 16,000 violations. It just says these are two different questions. One is can you show it for traceability? The other is can you actually recover for it? So my question is what case proves both? Texans United, by its plain terms, doesn't say that. And then the next paragraph specifically says summary judgment, final judgment, totally different questions. It just says we disagree with Crown's assertion that Texans United must at this stage establish that Crown violated the Clean Air Act on the occasions that the applicant suffered the harm, et cetera. Your Honor, the traceability test applies at all – is the same whether it's on a motion to dismiss, summary judgment, or a trial. So the test is the same. So in the motion to dismiss stage, a plaintiff would have to show that the allegations are sufficient. In a summary judgment stage, it would have to show that – would have to produce an affidavit, which would establish standing. And at the trial stage, plaintiffs would have to prevail by a preponderance of the evidence, which is what happened in this case. But there's nothing in this opinion that says that we are – that the court is allowing a plaintiff to recover on the merits for 16,386 event days on the basis of an allegation of one unlawful omission event, right? That's all I was trying to ask. No, Your Honor. That case stands for the proposition specifically that a plaintiff does not have to, through scientific evidence, link up specific violations to specific experiences of harm. That's what Texans United stands for, and that's what every court – every case that has ever decided a citizen-suit standing decision says the same thing. It's consistent. And if someone lives nearby a refinery, if they live there for a long time, if they're going to be affected by sulfur dioxide on one occasion, if the same violation is occurring at similar levels, why wouldn't they be affected by all of them? Your Honor, they would be affected by all of them. But as this Court has said many times and as the Supreme Court has said in Bennett v. Speer and this Court has said as recently as, I believe, Planned Parenthood v. Gee, the standing is not a proximate cause test. In this case, it's a fairly traceable test. And so a citizen-suit plaintiff does not have to prove – separate out, say, with scientific evidence, legal from illegal omissions or omissions that are coming from another facility rather than the facility that they're suing. That has been rejected, again, uniformly by every single court that has construed standing in a citizen-suit. At the end of the day, your clients are asking the federal courts to exercise Article III jurisdiction to take money from one party and put it – take money from one place and put it to a different place. It's an exercise of judicial jurisdiction. It's an exercise of judicial power. In order to do that, you have to show all three of the Lujan requirements, injury in fact, traceability, and redressability. And what I'm trying to understand is what case has said that at the end of the day you can go out and you can use the federal courts and federal jurisdiction to do that. It sounds like it's dispensing standing engrossed when you come forward with one plaintiff who says, I suffered this event. It happened on a steers exceedance day, and therefore 16,386 days of violation later, the federal courts used their power to move money from one place to another. Your Honor, 16,000 separate analyses for standing are not required in this case. The Supreme Court did not conduct, I believe it was 489 separate analyses in lay law. It did not – That point is well taken, and I saw those – I've read those cases. I understand that. But they also did not say that we don't need to do the 489, right? And you know it's obviously a well-established principle that drive by these jurisdictional holdings that are not considered. We don't take from that the implicit holding that there was jurisdiction in that case. Your Honor, one thing that shouldn't be lost in this case is that the district court found that the plaintiff's members lived – the district court made factual findings to establish all three elements of standing. The members lived very close to the plant. The plant averaged an emission event a day, every single day throughout the entire claims period. It averaged five violations a day. Exxon emitted 10 million pounds illegally. That comes to a ton and a half a day for eight years, and it is – So what would be the basis if someone – there's testimony from these plaintiffs. I had respiratory problems. I couldn't jog because of the way the air was polluted. And if sulfur dioxide was being emitted at excessive levels every day of the year, why would it be different on day two than day one or day 300, the traceability analysis? Well, the traceability analysis – the three-part traceability test has been well-established, and it requires that the defendant has discharged some pollutant in concentrations greater than allowed by the permit, which is this case, and the court found that, into an area in which the plaintiffs have an interest that is or may be adversely affected by the plaintiffs, which, again, is this case because the plaintiffs live very close to the plant. Is there record evidence – I know there's some air modeling that shows that releases of certain – there's a number of pollutants, but that this particular pollutant would have reached into this neighborhood. There's also those monitors that are in the neighborhoods. Yes, well, there's a few things. One is that I believe at Plaintiff's Brief at 45, page 45, we have a site to show that Exxon's violations caused safety thresholds to be exceeded. There was modeling by Exxon's own experts, and also referred to in our brief is a testimony from Exxon's own employees saying that a reduction of emissions events would improve the public health for the community, for the Baytown community. With respect to penalties deterring violations, which was subject to discussion with Mr. Post, penalties deter violations going forward, and Exxon's taking somewhat of a backward view of penalties, and the district court considered all of the – in considering the imposition of an appropriate penalty, arrived to this $20 million figure, and that would deter future violations of the emission limits that Exxon is violating. And I'd also like to emphasize that the court, district court found traceability to all of the claims asserted by Exxon. With respect to the district court's calculation of the economic benefit for the delayed implementation of four environmental – Before we get to that, you had started analyzing the three requirements for traceability. And how that was established. I wish you'd finish that. You didn't stop. Oh, yes, Your Honor. Yes, the second prong of the traceability test is that the defendant has discharged a pollutant into an area in which plaintiffs have an interest that is or may be adversely affected by the pollutants. And as I said, the district court found that the plaintiff's members in this case live very close to the plant. They live from a half a mile away to a mile away to a mile and a half away to two miles away. And they have respiratory problems. They get headaches. They have to curtail their outdoor activity as a result of emissions. And the third prong of the traceability test is that the pollutant causes or contributes to the kinds of injuries alleged by the plaintiffs. And in this case, the district court found that the various chemicals emitted illegally by Exxon do in fact contribute or cause the types of injuries alleged by plaintiffs. They did analysis of that. The overall purpose of Article III standing is to assure that plaintiffs have a sufficient personal stake in a controversy to get their case into court. And as this court held in Save Our Community, in an environmental case, this means that a plaintiff must have more than a general interest in environmental preservation. Or as this court said in Cedar Point Oil, a plaintiff must be more than a mere bystander. And again, the district court made specific findings that the plaintiffs established injury in fact, traceability, and redressability. And the approach to standing that Exxon urges has been expressly rejected by this court and Texans United and Cedar Point Oil. With respect to the district court's calculation of economic benefit for the delayed implementation of four environmental projects, I will first address the court's finding that Exxon in fact received an economic benefit from delaying the four projects, and then I will address the calculation of the amount of that benefit. In finding that Exxon in fact obtained an economic benefit from delaying the four projects, the district court followed the directions of this court in its previous decision and was mindful that the economic benefit must encompass every benefit that defendants received for violation of the law. Exxon now argues that the district court must separately tie compliance expenditures of projects specifically to prevention of each specific violation, but this court expressly ruled otherwise previously, and no court has ruled differently, and there is no need to relitigate that issue. The district court's finding that Exxon in fact received an economic benefit is a factual finding and can be only found to be clearly erroneous, but Exxon does not challenge any of the facts that undergird the ultimate finding of fact of economic benefit. All of the violations for which the district court found Exxon liable occurred during what are called emission events. The district court found that each of the four environmental projects was designed to reduce the number of emission events, reduce the amount of pollutants during those emission events, and that each of the four projects were designed to address specific causes of violations. Exxon itself took the position, and this is quoting from their own papers filed to the district court, the purpose of each of these environmental improvement projects is to reduce the number and frequency of reportable and recordable events and the emissions of all air contaminants emitted from them. As for the calculation itself, there's no dispute over the reliability of the methodology plaintiff's economist used, and the district court found that the inputs plaintiff's economist plugged into his calculation were correct. First, he took the costs of the four projects from Exxon itself, and these are undisputed. Second, he used 2005 as the starting point for calculating the economic benefit from the delay, and Exxon has never disputed that the four projects could have been implemented by 2005, which is how far back violations go. The amount of economic benefit was calculated at $14.2 million, and it was not an abuse of discretion for the district court to arrive at that figure. Where did the 2005 starting point come from? Is that like you said, so the violations start in 2005? The statute of limitations in the case goes back to 2005, and in this case the delay also goes back to 2005. The violations started in 2005, and the district court found that the four projects could have been implemented in 2005. But if there was an individual who lived half a mile from the Baytown facility in 2010, the suit was filed in December of 2010? Yes. And so the 60-day pre-suit notice letter would have gone out, I guess, in October of 2010? Yes, something like that. So there could have been an individual who lived half a mile from the Baytown facility, experienced an event linked to STEERS in, say, August of 2010, filed a lawsuit and then invoked STEER-recorded exceedances going back to 2005 to recover a civil penalty payable to the U.S. Treasury? That's correct. Got it. I just wanted to make sure I understood your position. The association isn't really adding anything to this case, right? It's purely one individual could do that on your theory of standing. Yes, Your Honor. This is an associational standing case. When did the violation stop, according to your evidence? I'm sorry, when did they stop? The violation ceased. They did not cease, and they occurred all the way through trial. And there was testimony at trial that the violations were ongoing, and district court found, as of the time of his decision, that all of the violations were ongoing. Why shouldn't we send this back to let Exxon have a shot at proving it's act of God defense? Well, there's a few things there, Your Honor. First of all, the act of God defense is not in the state implementation plan, and therefore under the Clean Air Act it cannot be asserted in this case. Secondly, there was an act of God provision in the state implementation plan, and under established law in order to, let me back up for one second, I'm sorry, Your Honor. In order to assert a state defense in a federal Clean Air Act case, the defense has to be in a federally approved state implementation plan. In this case, the act of God defense was not in the state implementation plan. There is a, and therefore Exxon is not entitled as a matter of law to assert it. Have you got a case for that? Yes, Your Honor. It is cited in our brief. I believe it is a TVA case from the 11th Circuit. I cannot recall off the top of my head what it is, but I know that it was cited in our brief. All right. The act of God, I think it's ten violations out of the 17,000. I mean, there's some advantage in streamlining things. I mean, what are those ten violations? It's highly unlikely they influence the penalty, but you just want to press on every single violation? No, Your Honor. The hurricane events can lead to very serious emission violations, and the refineries on the ship channel have startup and shutdown plans and hurricane plans. There's a difference between what you can legally prove and just what's strategic in streamlining a case and making it just more efficient. We're here eight years later, and who knows how much longer we might be here. But anyway, your strategy is your strategy. Yes, Your Honor. And again, the district court did find that we prevailed on the— I think you argued that ten are meaningless, but then why are you pursuing them? I mean, that goes both ways. Well, Your Honor, we did pursue all the violations that Exxon committed during the eight-year period, yes. And Exxon did not actually prove its act of God defense at trial. It did not put on the evidence to establish that all the criteria were— Did it have an opportunity to? Yes, Your Honor, it did. Similar to what I was just asking, is there—this is sort of putting my district court hat on, but is there any attempt after all these years to resolve this? Did you all avail yourself of the circuit mediation program or anything, or are we just going to fight until the death? Well, there were—we did not avail ourselves of the circuit mediation program, no. And I am afraid to say that, yes, it does look like this will be fought all the way, and I would not like to leave an impression, a contrary impression to this court. Thank you, Your Honor. I'd like to speak to three particular areas of attention. The first is the nature of the district court's findings here. The second is the nature of the Article III test after trial, and the third is the economic benefit issue. But let me begin with the nature of the precise findings made by the district court because I think that counsel takes some liberties with the precise details of what Judge Hittner found. What he found were five specific concrete and particularized injuries linked to at most 40 days of violations. The fact that there was evidence about other symptoms was not his finding. He made a finding of five injuries, and I think it's important to put that in context. All five of those injuries occurred between 2009 and 2012. As counsel just told you, they did a calculation of penalties back until 2005, but they have no standing connection for the first four years of that calculation. All five of those incidents occurred at the Oliphant's plant, but the vast majority, the vast majority of these violations that support the penalty involved the refinery, and the vast majority of the events at the refinery involved merely recordable events. Ninety percent of the violations in this case were only recordable, not reportable, not the big events that the plaintiffs ever could have witnessed and perceived. And so the actual details of the findings of the district court do not support the wide-ranging standing argument made by the plaintiffs here today. Second, with respect to the nature of the Article III test after trial, and Judge Costa, I want to speak directly to the questions that you posed to counsel about if you had this experience in one context, isn't it reasonable to infer you had that experience in the other context? That is categorically opposite to the rule of the Supreme Court, that the mere fact that a plaintiff suffered an injury in one occasion that is similar to conduct that occurred in other occasions. Unless the plaintiff proves the injury in the other occasion, you cannot establish standing. The Supreme Court calls that a theory of commutative standing. No, but if the evidence shows that the sulfur dioxide releases were detectable in someone's neighborhood, I don't know if the evidence would show, but if it shows that, then why wouldn't that establish every day of the year when there was an omission violation that the person who says, I smelled these odors, I smelled that, why wouldn't that as a matter of evidentiary proof establish the Supreme Court's requirement that you say? That's why the Gill decision is so important, because if the district court had found that, we'd be having a debate today about whether the evidence would support that finding. But the district court didn't find that. What he found – In one sentence it just says he was able to credibly correlate three – this is one of the two. Correct. To credibly correlate three flaring events he observed on specific events or deviations,  and there's a similar single sentence at the end of the other ones. Correct. So I'm not sure what we do with that. How do we evaluate whether that's clear error? Is the standard of review for – And I don't resist that finding. I'm not challenging those findings on a clear error basis. What I'm saying is that that's the extent of the findings. The only findings that he found that established a traceable connection are those five events. We're willing to live with those findings, but to suggest that that allows a broader inference contrary to the district court's findings and contrary to any evidence of a traceable connection to violations is right in the face of the Supreme Court's decision in Blum v. Lewis. I'm not talking about the district court finding. I'm saying in a hypothetical world where a court says, okay, every single day the liabilities established, every single day the emissions for sulfur dioxide were excessive. And a plaintiff comes in and says, yeah, I lived there half a mile from the plant every single day. I was always there. Maybe I went away one weekend to Mexico. Wouldn't that be enough to show that every single day that there was traceability? If there were evidence that a plaintiff experienced an event every single day and there was evidence correlating that event to a violation and the district court found that connection, then, of course, that would be enough. But that's the point. The district court has to find it. That's what the Supreme Court said in Gill. Going back to the fishermen example in a Clean Water Act case, I mean, the fishermen, you say they would only be able to have violations for the days they showed they went fishing? I'm sorry, Your Honor. Judge Davis has repeated that there was a case that says, oh, I like to fish there, but I don't fish there anymore because it's contaminated. Could you only have penalties for the days you were unable to fish? Absolutely. That's exactly the reason why civil penalties analysis requires that particularized analysis, and that's why this case is so different from Texans United because they keep relying on Texans United, but Texans United was a summary judgment case in which an injunction was requested to cut off a single ongoing source of a discharge, nothing like the particularized analysis that has to be made for these 16,000 civil penalty claims. If there are no further questions, I appreciate the Court's time. All right. Thank both counsel. The case is submitted. Next case is